13700

BRADLEY v. WASHINGTON FIDELITY NATIONAL INS. CO.

(171 S. E., 243)

*Messrs. Searson & Searson* and *Tobias & Turner,* for appellant,

*Messrs. Louis Harley* and *T. M. Boulware,* for respondent.

October 11, 1933.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

This case, in the Court of Common Pleas for Allendale County, while commenced on June 15, 1928, was not tried until April 29, 1931, and the appeal did not reach this Court soon enough to be heard earlier than the June, 1933, term.

The plaintiff, in her complaint, alleged the breach by the defendant, accompanied with fraudulent conduct, of an insurance contract, and she claimed actual damages in the sum of $48.00, and punitive damages in the sum of $2,-950.00. In her complaint, she said that some time in 1926, the defendant issued to her a policy, wherein it was provided that she should pay to the company a premium of 30 cents per week, and that, in consideration therefor, the company agreed to pay her "a benefit for sickness or accident of Six ($6.00) Dollars per week for accidental injury and sickness caused by such injury"; that in July, 1927, while the policy was in full force, the plaintiff was accidentally shot, wholly disabled, made sick, and was confined to her bed for twelve weeks, being visited during those weeks by a physician; that she performed all the conditions of the policy; that, under the terms of the policy, she was entitled to the sum of $72.00; that, during the third week of her illness, the company paid to her the sum of $12.00,

weekly benefits for the first two weeks of illness, and at that time collected from her the sum of 60 cents as premiums on the policy for the following two weeks; that the agent in charge of collections of the premiums from the plaintiff, who had been in the habit of visiting her home for the purpose of making such collections, thereafter avoided coming to the plaintiff to get the premiums, and during those times the company owed the plaintiff much more on the sick benefits than she was due the company for the premiums; that, finally, in March, 1928, Ford, one of the defendant's agents, visited the plaintiff in connection with the policy and the amount due to her thereunder; that "for the purpose of stealing for the defendant from the plaintiff" the sum of $48.00, due her by the company, in a "high-handed, oppressive, fraudulent, wilful" manner, the agent, who was well acquainted with the terms of the policy, falsely and fraudulently informed the plaintiff that she was not entitled, under its terms, to receive more than the sum of $12.00; and that the plaintiff, who was an uneducated and very ignorant negro woman, being unacquainted with her rights, through the fraudulent representations and conduct of the agent, accepted from him the sum of $12.00 and surrendered to him the policy, and thereby she was overreached and defrauded.

In its answer, served about fifteen months after the summons and complaint had been served, the time having been extended for its filing, the defendant denied all the material allegations of the complaint. But it admitted the execution and delivery of the policy involved in the suit. It further alleged, as a defense, that the claims for the benefits made by the plaintiff had been paid in full, and it further defended on the ground that the plaintiff, by a duly executed release in writing, for valuable consideration, had discharged the defendant from any and all rights or claims under the policy.

Replying to the answer, some seventeen months later, and about one week before the trial of the cause, the time for

reply not being questioned, the plaintiff said, if a release of any kind had been executed by her, that it had been obtained by the fraudulent conduct of the defendant's agent. She alleged that the $12.00 paid to her, and more, was due her under the terms of the policy, and if the defendant held a properly executed release of her claims, that the same had been obtained through the fraudulent conduct of the agent. Her attorneys, by written notice to the attorneys for the defendant, about the time of the serving of the reply, offered to return, and tendered to the attorneys for the defendant, the sum of $12.00, claimed by the defendant to have been paid to the plaintiff in consideration of the release, which tender was refused.

In the trial, the testimony of the plaintiff bore out the allegations of her complaint as to her injury and illness therefrom; the payment of $12.00 by the company for two weeks' sick benefit, at $6.00 per week; the failure of the agent to visit her home for a long period of time thereafter, although he was continually in the neighborhood soliciting business and collecting premiums from others, upon numerous occasions passing right near by her door; that, finally, the agent, Ford, did call upon her with regard to a settlement of her claim, and that by his fraudulent and false statements as to the amount she was entitled to receive, she, trusting and believing in his representations, accepted $12-.00, although she learned afterward that she was entitled to the sum of $48.00 more; and that, upon the false and fraudulent representations of the agent, she surrendered her policy to him.

Although Ford, the company's agent, was present in the Court, there was no denial by him of the testimony of the plaintiff and no evidence in the company's behalf was offered.

The verdict of the jury, and the judgment entered thereupon, were in favor of the plaintiff for $48.00 as actual damages, and $1,475.00 as punitive damages.

In the review of the trial in the lower Court, which we are asked to make by the defendant, eleven exceptions are presented.

The third, fifth, seventh, and eighth exceptions, relating to the refusal of the trial Judge to grant a nonsuit or directed verdict in the defendant's favor, appear to us to be based upon the position that there was noncompliance with the terms of the insurance policy on the part of the plaintiff, the insured; in other words, that there was a forfeiture on the part of the plaintiff. It is not proper to consider these exceptions; the defendant not having pleaded forfeiture in its answer, and no question thereabout having been raised, so far as we are able to find, in the trial. See *Dwyer v. Metropolitan Life Insurance Co.*, 132 S. C., 10, 129 S. E., 84. If forfeiture had been pleaded, however, or if the appellant thinks it was pleaded, it is, nevertheless, clear that there should not have been a nonsuit or directed verdict in the defendant's favor on that ground, for, under the evidence in the case, there was considerable proof as to waiver on the part of the insurer of any forfeiture claimed to have occurred.

The testimony very clearly showed that the company, having at the time knowledge of the character and the extent of the plaintiff's injury and illness, accepted and retained in its possession, without question, claims for benefits under the policy that had been filed. And also, without raising any question as to the proper filing of the claims, the company sent its agent to the home of the plaintiff for the purpose of procuring a settlement and release.

We are also of the opinion that we should not consider Subdivision (a) of the eleventh exception, which complains of the refusal of the trial Judge to grant the defendant's motion for a new trial, "because the amount of the verdict as to actual damages was incorrect, no premiums for the extended period of enforcement having been deducted therefrom". Our reason for declining to en-

tertain that ground of the appeal is due to the fact that we do not find in the record anything to show that the question was raised in the lower Court. This Court has repeatedly held that exceptions raising questions not before the trial Court will not be considered in an appeal. *Harper v. American Railway Express Co.*, 139 S. C., 545, 138 S. E., 354; *Ex parte McLeod*, 140 S. C., 1, 138 S. E., 355; *White v. Railway Co.*, 142 S. C., 284, 140 S. E., 560, 57 A. L. R., 634.

The first, second and fourth exceptions, grouped in appellant's argument under the heading "Necessity for tender of rescission," and its tenth exception, complaining of error in the trial Judge's charge on the matter of tender, may be considered together.

The first of these exceptions charges error in overruling the defendant's demurrer to the plaintiff's reply, for the reason that therein there was no allegation of "tender of a return of the consideration of the release prior to the commencement of the action." The second and fourth exceptions are to the effect that there was error in refusing the motion for a nonsuit because the plaintiff had retained, and had not tendered the return of, the consideration for the release she had executed. The tenth exception questions the correctness of the following instruction to the jury: "I hold in this case that tender could be made after the action was brought, when it appeared that counsel bringing the action did not know that any such release had been executed, when the plaintiff through her attorney tendered to the defendant the $12.00, and the defendant refused to accept it, relying upon the release according to its terms."

In the arguments of both the appellant and respondent, much attention has been paid to the question of the necessity of tender on the part of the plaintiff to the defendant of the sum of $12.00, paid to the plaintiff by the defendant at the time the alleged release was executed. We do not think it at all necessary to go into an extended discussion of that

subject. The essential legal principles involved therein, we think, have been clearly declared by this Court.

It was held on the authority of *Levister v. Southern Railway Company*, 56 S. C., 508, 35 S. E., 207, quoting syllabus: "In suit for damages from fraud in procuring surrender of rights under policies, insured's failure to return or tender insurer money paid him authorized nonsuit." *Lawrence v. Durham Life Insurance Co.*, 166 S. C., 203, 164 S. E., 632.

But in the case of *Harrison v. Southern Railway Company*, 131 S. C., 12, 127 S. E., 270, 271, the author of the opinion in the *Lawrence case*, Honorable W. C. Cothran, Acting Associate Justice, said this for the Court: "If the attorneys for the plaintiff had been in ignorance of the release, and had drafted their complaint without mention of it, then they would have had a perfect right to make tender of the consideration after the complaint was served."

The reply of the plaintiff to the matter of the release, set forth in the answer, expressly said, "the plaintiff," for reasons then stated, "did not inform her attorneys of the execution of said alleged release and they did not know of the existence of the same until the filing of the answer of the defendant." The reply as well as the notice, mentioned before, served about the same time, contained an offer of the return of the alleged consideration of the release, $12.00. The record shows that the attorneys for the defendant, in writing, refused to accept a return of the money.

It is clearly apparent, then, that the trial Judge was correct in overruling the demurrer.

The instructions to the jury, complained of, were in accord with the declarations made in the *Harrison case*.

We think the instructions were applicable and called for.

It may be, as is indicated in the tenth exception of the appellant, that there was no direct and positive evidence developed from any witness, who testified in the case, that the attorneys for the plaintiff did not know at the time of the

commencement of the action that the plaintiff had signed the release, alleged and depended upon by the defendant in its answer. No attorney for the plaintiff testified. The plaintiff was not asked directly about the information she had given her attorneys, but her testimony was such as to show that she did not know she had signed a release. If she did not know that she had signed such a paper, it is a fair inference that she failed to give her attorneys information that she had signed it. The complaint did not allege that the plaintiff had executed a release of her rights under the policy. It alleged the acceptance by the plaintiff of the sum of $12.00 and the surrender of the policy. The reply of the plaintiff, containing an allegation to the effect that the attorneys of the plaintiff did not know until the coming in of the answer of the alleged release, was read to the jury. In the course of the trial, the notice of plaintiff's attorneys to the attorneys for the defendant, dated April 25, 1931, of the tender of the $12.00, and reply of defendant's counsel, dated April 28, 1931, refusing that tender, were read to the jury, and they were introduced as exhibits. While plaintiff's counsel delayed a long time in replying to the defendant's answer, the reply was accepted without question, and about the same time the tender was made. The tender was not refused because it had been made too late.

Taking all the circumstances into consideration, the long delay on the part of the defendant in answering, and the long extension granted by its counsel for the filing of the reply, being especially noticed, and there being no statement to the Court at any time on the part of the defendant that the tender was refused because it was made too late, we think the trial Judge was warranted in assuming that it was an accepted fact in the case that counsel for the plaintiff, as he stated, "did not know that any such release had been executed," at the time of service of the complaint. Under the very liberal practice engaged in by the attorneys for both sides, we think, too, the tender, under the circumstances, was

made in seasonable time. And under the principle declared in the *Harrison case,* to which attention has been called, we think there was no error in any ruling of the presiding Judge, complained of in the exceptions under consideration.

The sixth and ninth exceptions present the position of the appellant that either a nonsuit or directed verdict in its favor should have been ordered, because there was an utter failure of proof of coercion or fraud on the part of the defendant's agent, Ford; it being contended that, at most, the statement of Mr. Ford, as to the amount the plaintiff was entitled to receive under the terms of her contract, $12.00, was "an expression of opinion apparently made in perfectly good faith" on the part of Ford.

The review of the evidence we have already given in support of the allegations of the complaint is, we think, sufficient answer to the contention made in these exceptions. The policy of insurance showed that the insured was entitled to $6.00 per week, while she was disabled because of her injury and illness. The contract to that effect was acknowledged by the insurance company by the payment of $12.00 for the first two weeks of her illness. The company, then fully informed as to the condition of the insured, and the likelihood that she would be "laid up" for many weeks, failed to have one of its agents to follow the usual custom of calling in person on the insured for the collection of the premiums, and apparently there is good reason to think that the purpose of such failure was to place the insured in the position where a forfeiture of the terms of the policy could be claimed. After a long wait, when it was evident in all probability that the insured would insist upon the payment of more money by the company, and when the company was due the insured much more than $12.00, an agent of the company visited the insured for the apparent purposes of making some kind of settlement, one of advantage to the company, and securing the possession of the policy held by the insured, and that agent represented to her that she was

entitled to only $12.00 under the policy's terms. The agent undoubtedly was, and certainly should have been, fully acquainted with the terms of the policy and the rights of the insured thereunder. The insured, an ignorant negro woman, not understanding and appreciating her rights, depended upon the agent for correct information, and had faith in his statements. There is nothing in the evidence to show that, in making the representations to the insured, the agent was only expressing an opinion. The plaintiff testified far from that. The agent, though sitting in the courtroom, did not tell the jury that this statement was only a matter of opinion. On the contrary, he told the jury nothing in defense of his conduct. There does not appear in the record any reason or excuse for the repudiation of the obligations of its contract on the part of the company and its agents, and the evidence required the presiding Judge to submit the issue of fraud to the jury.

The sole remaining question, that set up by Subdivision (b) of the eleventh exception, relates to the amount of the verdict as punitive damages; it being contended by the appellant that such verdict was capricious and unconscionable, and should be set aside by this Court.

In connection with this exception, the argument of the appellant makes reference to some statements made by one of the counsel for the respondent in his address to the jury. We do not consider anything relating to the statements of counsel in that address, however, for the reason that the agreed statement of facts shows that appellant's attorneys "did not ask the Court for any ruling or instruction to the jury, and the presiding Judge did not take his action as an objection, so made no ruling," and the matter was not presented to the trial Judge in the motion before him by the appellant for a new trial.

As to the amount of the verdict for punitive damages, we quote what was said by this Court in the case of *Weeks v. Carolina Power & Light Company,* 156 S. C., 158, 153 S.

E., 119, 124: "We have said repeatedly that we have little, if anything, to do with the amounts of verdicts. The proper amounts to be rendered, as either actual or punitive damages, are left, under our law, almost entirely to the trial jury and the trial Judge."

The verdict in this case was approved by the trial Judge, who saw the witnesses and heard their evidence. We feel assured that if he had thought that the verdict for punitive damages was excessive, he would have exercised the authority given him under the law to reduce the amount.

In our laws relating to insurance companies (Section 7944 of the Code), in order for an insurance company to do business in this State, it must show the insurance commissioner "that its dealings are fair and equitable and that it conducts its business in a manner not contrary to the public interests." In Section 7951 of the Code, there is a provision that the insurance commissioner may revoke the license of an agent of an insurance company "whenever it shall appear that said agent has violated the laws of this State, or has willfully deceived or dealt unjustly with a citizen of this State." It is the duty of insurance companies and their agents to carry out their contracts. It is clearly a violation of their duty to practice fraud or deception in the making of these contracts, or in their performance. In this case there is not only evidence to show that the agent of the company fraudulently acted in his dealings with the insured, but it may be fairly inferred from that evidence that some one with more authority than the agent had some information from the records in the hands of the company that the alleged fraud had been committed, and made no effort to right the wrong. Further, it may be inferred from the evidence that the agent, who made the settlement with the insured, was directed by some one higher up in the business of the company to make that particular visit to her home. This Court very often sympathizes with an insurance company, when we feel that some agent, seeking to establish a reputa-

tion for himself with his company in the soliciting of policies of insurance, or in making settlement of claims against the company, goes too far. That sympathy is not so great when we have the feeling that the conduct of the agent was approved or directed, by those above him in authority.

In the assessment of punitive damages against an insurance company, a jury and the trial Judge should take into consideration and distinguish, in our opinion, a fraudulent act committed by a subordinate agent, in the solicitation of business for the company and the settlement of claims, and the. act of a superior agent in directing, or approving, the fraudulent act of the agent with less authority. But after all, as indicated in the *Weeks case,* these verdicts, under our system of jurisprudence, are left almost entirely with the discretion of the jury and the trial Judge. In this case we find no legal ground for our disturbing the verdict.

The judgment of this Court is that the judgment of the lower Court be, and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.